**Justin BADGETT and John P. Leasha, Plaintiffs,**

v.

**RENT–WAY, INC., Defendant.**

**Civil Action No. 03–188 Erie.**

United States District Court,
W.D. Pennsylvania.

Sept. 30, 2004.

Harry F. Kunselman, Esq., Strassburger, McKenna, Gutnick & Potter, Pittsburgh, PA, Attorney for Plaintiff.

Robert B. Cottington, Esq., Eugene K. Connors, Esq., Reed Smith, Pittsburgh, PA, Attorneys for Defendants.

## *MEMORANDUM OPINION*

MCLAUGHLIN, District Judge.

Presently pending in this case brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, is a motion by the Defendant for summary judgment. We have subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. Having reviewed the parties' written submissions and heard oral argument on the matter, the Court will grant Defendant's motion for the reasons set forth below.

### I. BACKGROUND

Defendant Rent–Way, Inc. ("Rent–Way") has stores in 33 states across the country and is involved in the business of renting household merchandise to its customers on a rent-to-own basis. Rent–Way's customers may select rental merchandise in one of three ways: from among the merchandise on display at

Rent–Way's stores, from catalogs supplied by Rent–Way's vendors and maintained at Rent–Way's stores, or from merchandise displayed on computer monitors in Rent–Way's stores through a function known as eOffice.

If a selected item is in stock, it is typically loaded onto one of Rent–Way's trucks by an account representative, who then delivers the merchandise to the customer's residence and performs any required installation work. It is also possible for customers to take in-stock merchandise home themselves, even large items such as furniture.

When a selected item is not in stock, a store employee will generally check with other nearby Rent–Way stores to see if one of them has the item. If the item is available at another Rent–Way store, an account representative from the requesting store normally drives to the store that has the item, picks the item up, and delivers it to the customer's home.

If an item of selected merchandise cannot be located at another store—e.g., because it is not generally carried by Rent–Way or because special "add-on" features are requested—the item may be special-ordered out of the vendor's catalogue or through eOffice. Special order items are generally shipped by the vendor to the requesting Rent–Way store. Upon their arrival at the appropriate Rent–Way store, special-order items are physically marked as designated for the intended customer so that they do not wind up among the general inventory on the floor. Special-order items are generally delivered to the intended customer by an account representative within 24 to 48 hours of their arrival at the store. In some cases, a customer may opt to pick up the item at Rent–Way's store.

Plaintiffs Justin Badgett and John P. Leasha were formerly employed by Rent–Way as account representatives. Badgett worked at Rent–Way's New Brighton, Pennsylvania store from October 7 to December 22, 2002. Thereafter, he worked primarily at Rent–Way's Aliquippa, Pennsylvania store until his discharge on February 12, 2003. Plaintiff John P. Leasha served at the Aliquippa store from July 9, 2001 until February 23, 2002, when he resigned.

As account representatives, Plaintiffs' primary duties were to deliver and install merchandise in customers' homes, pick up from customers merchandise that was broken or that had not been fully paid for, and collect rental payments. Deliveries were made by Badgett and Leasha on Rent–Way trucks, although Badgett sometimes made deliveries in his own car. When delivering and picking up merchandise, Badgett and Leasha loaded the merchandise onto Rent–Way trucks and drove the trucks. Leasha was on the road every day making deliveries. Badgett made three to four deliveries per week and sometimes spent his entire work day making deliveries.

During their employment with Rent–Way, both Badgett and Leasha were one of only two account representatives in their respective stores. Leasha worked with another account representative by the name of William Lynn Claypoole, while Badgett worked with fellow-account representative Christopher Mack. Plaintiffs generally worked together with their respective partners on most days and shared the driving.

Following the termination of their employment, Plaintiffs commenced this case under the FLSA, claiming that Rent–Way violated the Act by failing to pay them (and other similarly situated employees) overtime for all hours worked in excess of forty hours per week. Rent–Way has

moved for summary judgment on the ground that Plaintiffs were exempt from the Act's overtime pay requirements by virtue of the motor carrier exemption set forth in § 13(b)(1) of the FLSA, 29 U.S.C. § 213(b)(1). For the reasons set forth below, we conclude that Defendant's assertion of the exemption is well-founded.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998). When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). A court may not consider the weight or credibility of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *Id.* But a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir.2001). Moreover, a genuine dispute as to a factual issue exists only if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

The narrow issue in this case is whether Plaintiffs are exempt from the maximum hour and overtime provisions of the FLSA under § 13(b)(1) of the Act, 29 U.S.C. § 213(b)(1), commonly known as the "motor carrier exemption." Section 13(b)(1) exempts any employee as to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of 49 U.S.C. § 31502. *See* 29 U.S.C.A. § 213(b)(1).[1] Section 31502 empowers the Secretary of Transportation to prescribe qualifications and maximum hours of service with respect to employees of (1) motor carriers and (2) "motor private carriers" "when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2).

◼ In order for the exemption to apply, the employee must: (a) be employed by a "motor carrier" or a "motor private carrier" as defined by the Motor Carrier Act and (b) engage in activities that directly affect the "safety of operation of motor vehicles" in the transportation on the public highways of passengers or property in interstate commerce. *See* 29 C.F.R. § 782.2(a) (2001); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181–82 (11th Cir.1991); *Hutson v. Rent–A–Center, Inc.*, 209 F.Supp.2d 1353, 1356 (M.D.Ga. 2001), *aff'd*, 37 Fed.Appx. 980, 2002 WL 1276984 (11th Cir. May 21, 2002) (Table No. 01–17261). Thus, an employee's exemption from the FLSA's maximum hour provision "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). It is the employer's burden to affirmatively prove that its employees come within the scope of the

---

1. It is the power of the Secretary of Transportation to regulate in this area, not the Secretary's exercise of that power, that triggers the exemption. *See* 29 C.F.R. § 782.1(a) (2004);

*Friedrich v. U.S. Computer Serv.*, 974 F.2d 409, 416 (3d Cir.1992); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181 n. 2 (11th Cir.1991).

overtime exemption, and entitlement to the exemption must be proven "plainly and unmistakably." *Friedrich v. U.S. Computer Serv.*, 974 F.2d 409, 412 (3d Cir.1992). *See also Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir.2002); *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1468 (9th Cir.1997).

### A.

The first requirement of the exemption is that the employer must be a "motor private carrier" within the meaning of the Motor Carrier Act. A "motor private carrier" is statutorily defined as "a person, other than a motor carrier, transporting property by motor vehicle when—

(A) the transportation is [across state lines, as provided in 49 U.S.C. § 13501];[2]

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise."

49 U.S.C.A. § 13102(13). Rent–Way is a corporation engaged in the business of leasing merchandise to its customers on a rent-to-own basis. It is not disputed that Rent–Way owns the merchandise it leases to its customers, nor is there any question that this merchandise is transported in furtherance of Rent–Way's commercial business. Thus, the only question for present purposes is whether Rent–Way transports merchandise in interstate commerce.

▮ Rent–Way has produced evidence that it engages in the interstate transportation of its merchandise in two ways. First, Rent–Way has shown that employees in its New Brighton and Aliquippa stores sometimes satisfy customer orders by obtaining the requested merchandise from other Rent–Way stores, including stores located in Ohio. According to Phillip Locke, Manager of Rent–Way's Pittsburgh Region, employees are sometimes called upon to pick up merchandise from Rent–Way stores in Ohio and drive the merchandise back to Pennsylvania for delivery to Rent–Way's customers in the Pittsburgh area. Mr. Locke has produced records showing that, during the periods of Plaintiffs' employment, merchandise was transferred from Rent–Way's stores in East Liverpool, Ohio on more than a dozen occasions to the Aliquippa store and, on nine occasions, to its New Brighton store. (Decl. of Phillip Locke at ¶¶ 10–11.) Moreover, both Plaintiffs individually acknowledge this practice of retrieving merchandise from other Rent–Way stores, including stores in Ohio, for delivery to customers in the Aliquippa or New Brighton area. Both Badgett and Leasha made at least one such trip to Ohio during their employment with Rent–Way. The interstate transportation criteria is satisfied in this regard since merchandise is moving across state lines when it is physically transferred by a Rent–Way employee from Ohio to Pennsylvania in order to fill a customer's order.

Second, Rent–Way has produced evidence that it occasionally fills special orders for its customers from merchandise supplied by out-of-state vendors. The record reflects that, for the time period at

---

**2.** Section 13501 gives the Secretary of Transportation jurisdiction over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—
    (A) a State and a place in another State;
    (B) a State and another place in the same State through another State ...
49 U.S.C.A. § 13501(1)(A) and (B).

issue here, Rent–Way obtained its merchandise from 38 different vendors, 36 of whom shipped their goods solely from locations outside of Pennsylvania. Because special orders involve the purchasing of new merchandise, they are processed through Rent–Way's purchasing department and require approval by upper management, such as a regional manager or divisional vice president. At the time "special orders" are placed, and prior to their being shipped, the items are specifically designated in Rent–Way's records for the intended customer in an area referred to as a "drop-down box." Each Rent–Way store maintains a list of orders specially placed for specific customers so that store employees can anticipate the arrival of the merchandise and segregate it for delivery. Upon their arrival at the appropriate Rent–Way store, special-order items are physically marked as "special" and identified by the intended customer so that they do not wind up among the general inventory on the floor. The items are then generally delivered to the designated customer by an account representative within 24 to 48 hours of their arrival at the store. Joseph Wilkevich, Divisional Vice–President for Rent–Way's Ohio Division and former Regional Manager of Rent–Way's Pittsburgh Region, has provided a declaration stating that it has been a "common occurrence" for the stores under his management, including the Aliquippa and New Brighton stores, to place special orders for customers. (Wilkevich Decl. at ¶ 8, Def.'s Reply Br. in Supp. of Mot. for Summ.

Judg. [Doc. No. 28] at Ex. D.) Mr. Wilkevich estimates that special orders occur approximately 4 to 5 times a month. (Wilkevich Depo at p. 46, Pl.s' Supp. Append. in Opp. to Def.'s Mot. for Summ. Judg. [Doc. No. 38] at Ex. C.)

■ In determining whether an employer's movement of goods within a state constitutes part of interstate commerce for purposes of the motor carrier exemption, federal courts have applied the "practical continuity of movement" test first described by the Supreme Court in *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), *to wit:*

> If there is a practical continuity of movement from the manufacturers or suppliers without the state, through [the employer's] warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse.

317 U.S. at 569, 63 S.Ct. 332 (holding that, where wholesale distributor of paper products and related items, pursuant to pre-existing contracts or understandings with its customers, ordered goods from out of state mills with customer's name printed on it and/or ordered goods from out-of-state manufacturers and suppliers in order to meet the needs of specified customers, such items remained part of "interstate commerce" for purposes of the FLSA notwithstanding their temporary placement in the distributor's warehouse prior to delivery to the customer).[3] *See, e.g., Bilyou,*

---

3. As the court in *Jones v. Centurion Investment Associates, Inc.*, 268 F.Supp.2d 1004 (N.D.Ill.2003) observed, the Court's analysis in *Jacksonville Paper*, though technically distinct from that which we are required to undertake here, nevertheless has practical relevance:

> In the *Walling [v. Jacksonville Paper Co.]* case, the Supreme Court was construing

the phrase "in (interstate) commerce" as it is used in the FLSA, where Congress intended to extend federal control to the farthest reaches of the channels of interstate commerce. *Id.* at 567, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. The scope of "transportation in interstate or foreign commerce" under the [Motor Carrier Act], so as to fall within the exemption, is deter-

300 F.3d at 223–24; *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993); *Klitzke*, 110 F.3d at 1470; *Jones v. Centurion Investment Assoc., Inc.*, 268 F.Supp.2d 1004, 1009–12 (N.D.Ill.2003).

Courts also consider what the " 'intended final destination' of the transportation [was] when that ultimate destination was envisaged at the time the transportation commenced." *Bilyou*, 300 F.3d at 223–24 (2d Cir.2002) (citation omitted). Whether a shipment is intrastate or interstate depends upon the "essential character" of the shipment. *Foxworthy*, 997 F.2d at 672 (citing *Texas N.O.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 122, 33 S.Ct. 229, 57 L.Ed. 442 (1913)). " 'Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment.' " *Id.* (quoting *Internat'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers v. Interstate Commerce Comm'n*, 921 F.2d 904, 908 (9th Cir.1990)). The Interstate Commerce Commission has elucidated this rule somewhat by determining that there is no "fixed and persisting intent" to ship goods in interstate commerce where:

> (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved

through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale · or allocation from storage.

*See* 29 C.F.R. § 782.7(b)(2) (citing *Ex Parte No. MC–48, Determination of Jurisdiction Over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State*, 71 M.C.C. 17, 29 (1957)).

Applying these principles, federal courts have sometimes found that an employer's movement of goods within a single state constitutes movement in interstate commerce for purposes of the motor carrier exemption. In *Bilyou*, for example, the Second Circuit Court of Appeals affirmed the district court's ruling that beverage distributor drivers who delivered their product solely within New York State were exempt from the FLSA. As part of their duties, the drivers collected empty beverage containers and returnable or refillable containers and transported these items to their employer's New York ware-

---

mined by the MCA and is not identical with the FLSA's "in (interstate) commerce." 29 C.F.R. § 782.7(a). The regulations observe that the ICC decisions prior to 1966 appear to have construed the MCA more narrowly than the courts have construed the FLSA. 29 C.F.R. § 782.7(b)(1). However, the DOL interprets the exemption for regulatory enforcement purposes by assuming that a movement in interstate commerce for purposes of the FLSA is also a movement in interstate commerce for purposes of the MCA. *Id.*

Under this enforcement policy it will ordinarily be assumed by the Administrator that the interstate commerce requirements of the section 13(b)(1) exemption are satisfied where it appears that a motor carrier

employee is engaged as a driver, driver's helper, loader, or mechanic in transportation by motor vehicle which, although confined to a single State, is a part of an interstate movement of the goods or persons being thus transported so as to constitute interstate commerce within the meaning of the Fair Labor Standards Act. *Id.* The regulations note that this policy is without prejudice to any rights of employees under section 16(b) of the FLSA (29 U.S.C. § 216(b)). *Id.* However, ... the "practical continuity of movement" test set out in the *Walling* case is also applied in the context of a private enforcement action under § 216(b).

268 F.Supp.2d at 1009.

house and distribution center. An entity related to the employer then packaged and returned the refillable containers to out-of-state breweries. The court observed that, "from the moment it receives [the refillable containers], [the employer] has a 'fixed and persisting intent' to return the refillable containers to out-of-state breweries." 300 F.3d at 225. The court concluded that the employer's role in the process of collecting, transporting, and exporting empty containers was part of the continuous movement of those goods in interstate commerce for purposes of applying the motor carrier exemption. *Id.*

In *Foxworthy, supra,* the Tenth Circuit Court of Appeals ruled that an Oklahoma-based route-driver for an Arkansas dairy, who delivered dairy products entirely within Oklahoma, was engaged in interstate transportation of goods for purposes of triggering the motor carrier exemption. The court found it significant that the driver's Oklahoma customers had agreed to purchase specific quantities of dairy products, that the products were not sold from any terminal storage facility or held in storage pending the receipt of actual orders but had been segregated for delivery on the driver's route from the moment they left Arkansas, and that they were stored only for short periods of time not exceeding three days. The court also ruled that the driver's activities in collecting empty milk crates was independently sufficient to establish the necessary interstate commerce nexus where the crates were destined for immediate shipping to the processing plant in Arkansas. 997 F.2d at 673–74.

In *Klitzke, supra,* the Ninth Circuit Court of Appeals held that the motor carrier exemption applied to a motor private carrier whose primary business was not transportation, and whose route was entirely within the state of Oregon, where the deliveries included items specially ordered by the carrier for customers from out-of-state vendors. The defendant employer in *Klitzke* was a corporation in the business of providing laundry and uniform rental and sale services in Eugene, Oregon. The plaintiff was a route salesman whose duties included delivering linens and garments to customers entirely within Oregon. Some of the garments the plaintiff sold were ordered for customers from out-of-state vendors who shipped their goods via common carrier to the defendant. The evidence showed that the defendant, upon receiving its customers' orders, immediately placed them with out-of-state vendors. Although the defendant was technically the vendors' customer, orders were placed on behalf of specific customers. Upon receiving a specially ordered item, the defendant would unload, catalog, re-label, and distribute the item, usually within two days. The court determined that the rule of *Jacksonville Paper* governed, i.e.: "even though the shippers did not know the goods' ultimate destinations, the orders were placed and the goods were shipped to satisfy contracts between [the defendant] and its customers that specified a final place of delivery within Oregon *other than [the defendant's] warehouse.*" 110 F.3d at 1470 (emphasis in original). Thus, the goods were in "continuous transportation" until delivered to the defendant's customers. *Id.* (citing *Reich v. American Driver Serv., Inc.,* 33 F.3d 1153, 1155 n. 3 (9th Cir.1994) and *Shew v. Southland Corp.,* 370 F.2d 376, 380 (5th Cir.1966)). *See also Jones v. Centurion Investment Assoc., Inc.,* 268 F.Supp.2d 1004 (N.D.Ill.2003) (where employer's route men drove trucks from Illinois warehouse and, after delivering bread within Illinois, collected empty bread trays and returned them to the warehouse where trays remained for up to 24 hours before being returned to Indiana, trays

were "in a practical continuity of movement" between the Illinois stores and the Indiana bakery such that route men were subjected to motor carrier exemption of the FLSA; bread trays' temporary pause in Illinois warehouse did not remove them from interstate commerce).

We find the reasoning of *Klitzke* particularly persuasive as it involved circumstances closely analogous to the facts at hand. As in *Klitzke,* the employer's (i.e. Rent-Way's) regular business activities include special orders placed on behalf of its customers with (primarily) out-of-state vendors. Special order items are predesignated for the intended customer in Rent–Way's records. Upon their arrival at the store, they are specially marked with a black pen and the intended customer identified. The items are set aside such that they will not be placed on the store's sales floor as general inventory. They are typically delivered to the customer within 48 hours. This is sufficient to establish that the goods are in "continuous interstate transportation" until delivered to the intended customer. As in *Klitzke,* the special orders are placed and the goods are shipped pursuant to a contract or understanding between Rent–Way and its customers that contemplates a final place of delivery within Pennsylvania other than Rent–Way's general inventory. The factors set forth in *Ex Parte MC–48* are not implicated as to this particular merchandise. In sum, Rent–Way's delivery of special order items, though wholly intrastate, partakes of interstate commerce because it is part of the practical continuity of movement of the merchandise in interstate commerce.

Plaintiffs, however, contest the sufficiency of Rent–Way's evidence on a number of grounds. They claim that the interstate aspect of Rent–Way's special order items terminates upon the items' arrival and placement by Rent–Way into its inventory. Plaintiffs point out that, upon arrival at the requesting Rent–Way store, special order items are entered into Rent–Way's computer inventory records and placed in the same storage area as items of general inventory. We are not persuaded that these practices undermine the items' status as merchandise conveyed in interstate commerce. Rent–Way's characterization of a special order item as inventory appears to be no more than an accounting formality. At all times the special order item remains designated for its intended customer, both physically and in terms of Rent–Way's own internal record keeping system. Further, we do not believe the mere fact that special order items share the same physical space as general inventory deprives the special order items of their interstate character. It is significant that the special merchandise remains earmarked for the intended customer at all times and is placed in Rent–Way's storage for only a brief period of time.

Plaintiffs cite *Foxworthy* for the proposition that the record is insufficient to determine whether Rent–Way had a "fixed and persisting intent" to ship goods in interstate commerce. They claim the record is inchoate because it is silent as to several factors, such as: whether Rent–Way's storage center has a low "throughput" compared to its storage capability; whether special order items are shipped on a "predetermined" ordering cycle; whether the carrier is in continuous possession of the product until delivery, etc. In *Foxworthy,* the court cited these and other factors as "relevant" to the interstate commerce analysis. *See* 997 F.2d at 673. The court did not hold that the factors were either exhaustive or strict prerequisites for application of the motor carrier exemption. On the contrary, we interpret them as permissive, non-exhaustive factors for consideration. In any event, many of the

listed factors are susceptible to analysis based on the present record. For example, we have already noted that the "length of time movement of the product is interrupted by storage" in this case is quite brief, as special order items are typically delivered within 48 hours of their arrival at the store. *Id.* The evidence suggests that Rent–Way is in "continuous possession of the product until delivery." *Id.* Special order items, though temporarily placed in storage along with general inventory, are not processed or commingled with general inventory in any meaningful sense once they arrive at the requesting Rent–Way store. *Id.* Instead, special order goods remain at all times "intended for [the] particular customer[ ]" who requested it. *Id.* And it appears that Rent–Way's brief custody of special order items serves, in part, as "an efficient opportunity to convert the means of delivery from one form of transportation [i.e. the vendor's shipper] to another [Rent–Way's own trucks]." *Id.* Each of these factors supports our conclusion that Rent–Way's delivery of special order items constitutes participation in interstate commerce.

Plaintiffs also dispute the sufficiency of Rent–Way's proof concerning transfers of merchandise from other Rent–Way stores in Ohio. They have submitted their own declarations and that of Mr. Claypoole stating, for example, that it was "common practice" among store managers to electronically transfer items back and forth in order to circumvent Rent–Way's rule against maintaining inventory items for more than ninety days. In light of this practice, Plaintiffs contend that Mr. Locke's computerized figures concerning interstate transfers of merchandise from Ohio to Pennsylvania are inherently unreliable and "very likely represent ... computer transfers." (Pl.'s Br. in Opp. [Doc. No. 24] at p. 9.)[4]

However, Rent–Way has responded to this challenge by presenting evidence that only four of the transfers referenced by Mr. Locke can be accounted for as purely electronic transfers. Charles Levesque, a Systems Analyst II for Rent–Way, has provided a declaration stating that every item of merchandise transferred from one Rent–Way store to another is assigned a

---

4. Plaintiffs also contest the competency of Mr. Locke's testimony concerning transfers of items from Rent–Way's Ohio to Pennsylvania stores. More specifically, Plaintiffs dispute that the charts offered in support of Mr. Locke's declaration are a summary of Rent–Way's records maintained in the ordinary course of its business relative to transfers of merchandise between Ohio and Pennsylvania stores. Plaintiffs object that the charts themselves were created for litigation purposes, are not reflective of a normal business cycle such as a month, quarter, or fiscal year, pertain only to the time periods spanning Plaintiffs' employment, and fail to show the ratio of interstate transactions to total transactions for each store. However, the selective nature of the information contained in the charts is not a basis for this Court to exclude them from consideration as part of the record. Documents offered as summaries under Fed.R.Evid. 1006 are necessarily selective compilations of relevant information created for litigation purposes; indeed, that is the very reasons for their existence. *See* Advisory Committee Note to Fed.R.Evid. 1006 ("The admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury."). It is not necessary under Rule 1006 that the charts themselves conform to the requirements of a business record as defined in Fed.R.Evid. 803(6). Moreover, all that is required under Rule 56(e) is the production of such evidence "as would be admissible at trial"—in other words, the proffer must be *reducible* to admissible evidence. *See J.F. Feeser, Inc. v. Serv-A–Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir.1990). Plaintiff has not shown that the charts offered in support of Mr. Locke's declaration contain information incapable of being reduced to admissible evidence.

unique number under Rent–Way's Point–of–Sale data system. Thus, by comparing the unique numbers assigned to merchandise that has been transferred to and from Rent–Way's Ohio stores and its Aliquippa and New Brighton stores, one can determine which transfers were purely electronic "ghost transfers." According to Rent–Way, a cross-check of these unique numbers shows that only four of the transfers, and reverse transfers, involve the same item numbers. Thus, Rent–Way infers, only four of the transfers (all of which occurred between Ohio to the Aliquippa store) could have been electronic "ghost transfers." This evidence stands unrebutted and it competently demonstrates that merchandise crossed state lines on numerous occasions during Plaintiffs' employment in furtherance of Rent–Way's business.

Plaintiffs also attempt to minimize Rent–Way's involvement in interstate commerce by asserting that the retrieval of merchandise from other Rent–Way stores, including those from Ohio, was a "rare event." According to the estimates of Plaintiffs and Mr. Claypoole, such transfers accounted for less than one (1) delivery out of one hundred-twenty (120) in a good sales month. The remainder of sales, according to Mr. Claypoole, came from general inventory or merchandise obtained from other Rent–Way stores in the Pittsburgh region. Mr. Claypoole estimates that he retrieved merchandise from Ohio on less than ten occasions during his two years of employment. He further asserts that special orders were "actively discouraged" for a significant time and that fewer than 10 special orders were placed through eOffice during his tenure. However, "[t]he MCA does not limit motor private carriers to those who ship large amounts of property or ship property as their principal business; it merely requires that they transport property 'to further a com-

mercial enterprise.'" *Friedrich*, 974 F.2d at 417. *See also Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947) (common carrier, whose involvement in interstate commerce constituted no more than 4 percent of its total annual business was exempt from FLSA where its drivers indiscriminately carried out both interstate and intrastate business). Rent–Way satisfies this requirement and, therefore, it is a "motor private carrier" within the meaning of the MCA.

Finally, Plaintiffs object that there is no proof they or any other Rent–Way employees from the Pittsburgh region *actually* traveled to Ohio to retrieve items for delivery to Pennsylvania customers. Similarly, Plaintiffs argue, there is no proof that Pennsylvania Rent–Way employees *actually* placed any special orders or *actually* delivered any specially ordered items that allegedly came from out-of-state vendors. Moreover, Plaintiffs claim, Rent–Way cannot prove that special orders came from out-of-state, as opposed to in-state, distribution sites.

We find these arguments unconvincing. As to trips made to retrieve merchandise from other Rent–Way stores in Ohio, Badgett, Leasha and Claypoole each separately acknowledged that these trips occurred and that they had each made such trips in the course of their employment. Based on his knowledge of Rent–Way's business practices, Phillip Locke, Manager of Rent–Way's Pittsburgh Region, has confirmed that employees in the Aliquippa and New Brighton stores have been called upon to drive to Ohio stores to obtain merchandise on behalf of Pennsylvania customers. As to special order merchandise, Joseph Wilkevich has stated that such orders were common, occurring on average 4–5 times per month. Claypoole disputes the frequency of special order purchases but acknowledged that they were placed on nu-

merous occasions during the course of his own employment. Both Badgett and Leasha admitted in their depositions that they and other account representatives were responsible for the delivery of special order items, although they might not personally be aware of an item's status as special order merchandise at the time of making delivery. Moreover, the fact that 36 of Rent–Way's 38 vendors shipped exclusively from locations outside of Pennsylvania during the period of Plaintiffs' employment leads logically—if not inescapably—to the conclusion that Rent–Way does receive (and *has* received) shipments of goods from vendors outside of the Commonwealth.

Plaintiffs' objection seems to be premised upon the fact that Rent–Way: (a) has not specifically documented which, if any, of its employees made trips to Ohio during the relevant time period and (b) has not maintained documents from which special order information can be retroactively culled and analyzed. However, we do not believe the law imposes such a high burden on Rent–Way.[5] The Department of Transportation has stated that evidence of the kind presented here is sufficient:

> The [Federal Highway Administration] view is that in order to establish jurisdiction under 49 U.S.C. [§ ]304 the carrier must be shown to have engaged in interstate commerce within a reasonable period of time prior to the time at which jurisdiction is in question. The carrier's involvement in interstate commerce must be established by some concrete evidence such as an actual trip in interstate commerce or proof, in the case of a "for hire" carrier, that interstate business had been solicited. If jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be presented that the carrier has engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs. *Satisfactory evidence would be statements from drivers and carriers,* and any employment agreements.

46 FR 37902–02, 1981 WL 115508 (July 23, 1981) (emphasis supplied). Because Rent–Way has not documented each interstate transport of its merchandise, Plaintiffs claim we should assume that no such transports occurred. However, in opposing Rent–Way's motion for summary judgment, Plaintiffs must designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is not sufficient to "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An employer's proof of entitlement to the motor carrier exemption must be "plain and unmistakable," but this does not mean proof beyond all doubt. For the reasons discussed, we find the evidence sufficient to establish, beyond any genuine dispute, that Rent–Way at all relevant times was a "motor private carrier" because it engaged in the interstate transportation of property in furtherance of its own commercial interests.

---

**5.** Plaintiffs cite *Bowe v. SMC Electrical Prod., Inc.,* 935 F.Supp. 1126 (D.Colo.1996) for the proposition that an employer must always provide documented records of an employee's transportation of goods in interstate commerce in order to meet its burden of proving that the motor carrier exemption applies. We do not read *Bowe* so broadly. To the extent *Bowe* does support the Plaintiffs' interpretation, however, we simply note that it is in apparent conflict with the DOT's interpretive ruling, as set forth below, and has not found widespread support among other jurisdictions.

### B.

We next consider the nature of Plaintiffs' employment—specifically, whether they engaged in activities that directly affected the "safety of operation of motor vehicles" in the transportation on the public highways of passengers or property in interstate commerce. *See* 29 C.F.R. § 782.2(a). As an initial point, we readily conclude that Plaintiffs' job duties affected highway safety. It is uncontested that Plaintiffs' regular responsibilities included driving Rent–Way vehicles (or their own vehicles) for the purpose, among other things, of delivering merchandise. Badgett admits that he made deliveries several times each week and sometimes spent his entire day making deliveries. (Badgett Depo. at pp. 47–48.) Leasha admits that he was on the road every day for his job. (Leasha Depo. at p. 12.) Both Plaintiffs shared the driving responsibilities with their respective co-workers. The United States Supreme Court has specifically concluded that drivers affect highway safety. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947); *Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947). *See also* 29 C.F.R. § 782.2(b)(2) (2001); *Jones v. Centurion Investment Assoc., Inc., supra,* (intrastate drivers of trucks on which bread trays were loaded as part of the movement of trays through interstate commerce had more than *de minimis* effect on highway safety); *Hutson,* 209 F.Supp.2d at 1357 (employees who drove employer's trucks in making deliveries of rent-to-own merchandise affected highway safety).[6]

To partake of the motor-carrier exemption, however, Rent–Way must also establish that Plaintiffs' duties affected highway safety *in the interstate transportation of goods.* Plaintiffs insist that, even if their trips to Ohio and deliveries of special order items involve interstate commerce, the motor carrier exemption should not be applied because, in Plaintiffs' opinion, Rent–Way has failed to prove these occurrences constituted more than a *de minimis* portion of their job responsibilities. Otherwise stated, Plaintiffs maintain that their involvement in interstate commerce, if any, was at best *de minimis,* thereby rendering them non-exempt employees.

■ We are not persuaded that Plaintiffs' "*de minimis* theory" defeats application of the motor carrier exemption in this case. In determining whether an employee's job responsibilities have a substantial impact on interstate commerce highway safety, it is the *nature* of the employee's regular job duties that is most important, not necessarily the *percentage* of the employee's involvement in duties affecting highway safety in interstate commerce:

> ... As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers ... employed by a common carrier and engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, either regularly *or from time to time,* safety-affecting activities .... he comes within the exemption in all workweeks when he is employed at such job. .... [T]he rule applies *regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek,* and the exemption will be applicable *even in a workweek when the employee happens*

6. Plaintiffs' responsibilities also included loading merchandise onto Rent–Way trucks for delivery. This type of activity has also been acknowledged as among those "directly affecting ... 'safety of operation.'" 29 C.F.R. § 782.2(b)(2) (citing authorities).

to perform no work directly affecting "safety of operation."

29 C.F.R. § 782.2 (2004) (emphasis supplied). *See also* RULES AND REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, "Application of the Federal Motor Carrier Safety Regulation," 46 FR 37902–02, 1981 WL 115508 at \*37902 (July 23, 1981) ("[E]ven a minor involvement in interstate commerce as a regular part of an employee's duties will subject that employee to the jurisdiction of the [Federal Highway Administration].") (citing case law); *Levinson*, 330 U.S. at 674–75, 67 S.Ct. 931 ("It is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [Secretary of Transportation's] power to establish reasonable requirements with respect to qualification, maximum hours of service, safety of operation and equipment."); *Yellow Transit Freight Lines, Inc. v. Balven*, 320 F.2d 495, 498 (8th Cir.1963) ("The factual question to be decided is not whether a substantial part of [the employee's] duties affected the safety of the operations but, rather, whether any of [the employee's] duties had a *substantial effect* on motor vehicle safety.") (emphasis in the original); *Sinclair v. Beacon Gasoline Co.*, 447 F.Supp. 5, 9 (W.D.La. 1976) ("the character of the [employee's] activities rather than the proportion of time of activities determines the [Secretary of Transportation's] power"), *aff'd*, 571 F.2d 978 (5th Cir.1978) (per curiam).

Consistent with this principle, courts have found drivers to be covered by the motor carrier exemption even where they engage in, or are subject to, only a small percentage of interstate driving. *See, e.g., Morris v. McComb, supra* (where interstate hauling of freight, which comprised approximately 4 percent of employer's total business, was indiscriminately assigned to employer's drivers, entire class of employee drivers were covered by exemption); *Barefoot v. Mid–America Dairymen, Inc.*, 826 F.Supp. 1046, 1049 n. 2 (N.D.Tex.1993) (truck drivers who made 28 trips over the course of 4 years in which they hauled employer's unprocessed milk to other facilities across state lines came within the motor carrier exemption; although employer shipped millions of pounds of unprocessed milk across state lines each year, and therefore, plaintiffs' interstate trips reflected only a small portion of the total milk hauled out of Texas, the amount of plaintiffs' interstate hauling was not determinative of whether exemption would apply), *aff'd*, 16 F.3d 1216 (5th Cir.1994) (TABLE, NO. 93–01684); *Brennan v. Cardinal Indus., Inc.*, No. C–2–74–563, 1976 WL 1720 (S.D.Ohio Mar.8, 1976) (exemption applied to employer's truck drivers even though less than one percent of the trips made by drivers during the period in question were interstate transports).

The Department of Labor's regulation also recognizes that "where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties." 29 C.F.R. § 782.2. In *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947), the United States Supreme Court recognized a *de minimis* exception where, e.g., "the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck ... form[s] so trivial, casual or occasional a part of an employee's activities, or ... relate[s] only to ... such [a] limited handling of [the freight articles]" that the activities cannot fairly

be characterized as affecting "safety of operations." In *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21, 29 (5th Cir.1964), the Fifth Circuit Court of Appeals applied *Pyramid* and determined that the exemption was inapplicable to warehousemen who assisted in loading delivery trucks but lacked discretion as to the manner in which loading was done, and who sporadically rode in or drove the trucks, but not as part of their regular duties. *See also Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 42–43 (5th Cir. 1962) (warehouseman whose primary job was handling empty and full bottles within the warehouse, who only infrequently helped load supply truck, and who did not regularly load the distributing trucks was not subject to exemption since no part of his job involving assisting in the actual loading of any interstate vehicle and his infrequent help to driver of supply truck was *de minimis* ).

In other cases, courts have found the motor carrier exemption inapplicable where the carrier's involvement in interstate commerce was too remote, unlikely or simply not proven. In *Baird v. Wagoner Transportation Co.*, 425 F.2d 407 (6th Cir.1970), a carrier's mere possession of a certification allowing it to ship petroleum interstate, which had not been used since 1959, was insufficient to bring it within the motor carrier exemption. In *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232 (7th Cir. 1961), the court found the exemption inapplicable to certain employees because the parties had stipulated that the subject employees had never been used in interstate commerce and could not reasonably be expected to handle interstate runs in the

normal course of their duties. In *Coast Van Lines v. Armstrong*, 167 F.2d 705 (9th Cir.1948), the carrier failed to prove its entitlement to the exemption during the time period in question because the employer had presented evidence of interstate transportation during one month only.

As our Circuit Court of Appeals has observed, "[a] number of courts have held that drivers should seldom, if ever, fall within th[e] *de minimis* exception." *Friedrich*, 974 F.2d at 417 n. 10 (citing *Levinson, supra*, at 677–78, 67 S.Ct. 931; *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 210 (1st Cir.1972); *Sinclair*, 447 F.Supp. at 11). In *Levinson, supra*, the Supreme Court, in comparing the responsibilities of drivers and loaders, observed that a "driver's work more obviously and dramatically affects the safety of operation of the carrier during every moment that he is driving ..." 330 U.S. at 678, 67 S.Ct. 931. In *Crooker*, the First Circuit Court of Appeals noted that the *de minimis* rule "has been applied ... where the employee's connection with anything affecting interstate motor carrier operations was so indirect and casual as to be trivial.... The activities of one who drives in interstate commerce, however frequently or infrequently, are not trivial." 469 F.2d at 210. And in *Sinclair, supra*, at 11, the court concluded that "the de minimis rule should seldom, if ever, be applied to one who drives a motor vehicle carrying property of a private carrier in interstate commerce."[7]

█ In any event, however, we conclude Plaintiffs are exempt from the FLSA's maximum hours and overtime require-

---

7. The Court recognizes the decision in *Coleman v. Jiffy June Farms, Inc.*, 324 F.Supp. 664 (S.D.Ala.1970), aff'd, 458 F.2d 1139 (5th Cir.1971), wherein the interstate activities of the employer's drivers were found to be *de minimis* because each driver spent, on average, only .00343 percent of his time in interstate activity. However, *Coleman* appears to represent a "minority view." *See* RULES AND REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, *supra*, 46 FR 37902–02, 1981 WL 115508 at *37903.

ments regardless of the number of interstate/intrastate trips they actually made because, at all relevant times, *they could have been called upon in the regular course of their employment to make trips affecting interstate commerce.* The relevancy of this consideration has been clearly articulated by both the Department of Transportation and the Department of Labor. The latter agency has stated that the motor carrier exemption will apply if the bona fide duties of the job performed by the employee are in fact such that he is— or "is likely to be"—called upon in the ordinary course of his work to perform, "either regularly or from time to time," the requisite safety-affecting activities. *See* 29 C.F.R. § 782.2(b)(3). *See also* DOL Wage and Hour Division's Field Operations Handbook, § 24e01(b) (May 13, 1982) (Ex. F. to Def.'s Append. in Supp. of Mot. for Summ. Judg. [Doc. No. 18]) (where driver has not made an actual interstate trip, he/she may still be subject to DOT's jurisdiction if: (1) the carrier is shown to have an involvement in interstate commerce and, (2) it can be established that the driver "could have, in the regular course of his/her employment, been reasonably expected to make one the carrier's interstate runs."). The DOT has stated in an interpretive ruling that "[i]f, in the regular course of employment a driver is, or could be, called upon to transport a shipment in interstate commerce the driver would be subject to the [Federal Highway Administration's] jurisdiction." Rules and Regulations of the Department of Transportation, Federal Highway Administration, *supra*, 46 FR 37902–02, 1981 WL 115508 at *37902.

Moreover,

[e]vidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to 49 U.S.C. § 304 for a 4–month period from the date of the proof. The FHWA believes that the 4–month period is reasonable because it avoids both the too strict week-by-week approach and the situation where a driver could be used or be subject to being used once and remain subject to jurisdiction under 49 U.S.C. § 304 for an unlimited time.

*Id.* at *37903. The Department of Labor has accepted this 4–month rule, as set forth in its Field Operation Handbook:

Satisfactory evidence [concerning an employee's reasonable expectation of making an interstate run in the regular course of his/her employment] could take the form of statements from the carrier's employees, or documentation such as employment agreements. Where such evidence is developed with regard to an employee, DOT will assert jurisdiction over that employee for a 4–month period beginning with the date they could have been called upon to, or actually did, engage in the carrier's interstate activity. Thus, such employees would be exempt under Sec 13(b)(1) for the same 4–month period, notwithstanding references to the contrary contained in IB 782.2.

DOL Wage and Hour Division's Field Operations Handbook, § 24e01(b), *supra.*

Here it is not disputed that Plaintiffs, at all times, were subject to being called upon in the regular course of their duties to retrieve merchandise from other Rent-Way stores for delivery to their own customers. This would include, if necessary, trips to other Rent–Way stores in Ohio. Similarly, it is undisputed that Plaintiffs' regular duties made them subject to delivering special order items to their customers, including those transported through interstate commerce. Both Plaintiffs testified that their duties never significantly changed throughout their employment

with Rent–Way. We find that the record is sufficiently developed to establish, beyond any genuine dispute, that Plaintiffs, at all times, could reasonably be expected to engage in interstate commerce driving on behalf of Rent–Way. Thus, they were always subject to the jurisdiction of the Secretary of Transportation.

Plaintiffs make much of the fact that, at no time during Plaintiffs' employment did Rent–Way invoke the motor carrier exemption. On the contrary, there is record evidence showing that, at least for a period of time, Rent–Way treated Plaintiffs and Mr. Claypoole, as well as other similarly situated employees, as non-exempt. We find little significance in this evidence. In the context in which this litigation now presents itself, the question whether Plaintiffs fall within the motor carrier exemption is strictly a legal one. No facts material to our resolution of this issue are genuinely disputed. Accordingly, Rent–Way's prior treatment of Plaintiffs, or other similarly situated employees, as "non-exempt" does not constitute any sort of factual "admission" which could be binding upon the company for present purposes. In fact, we do not consider Rent–Way's prior conduct relevant at all to our present analysis. For the reasons previously set forth, we conclude that Rent–Way has proved, plainly and unmistakably, that it is entitled to invoke the motor carrier exemption relative to the Plaintiffs' employment.

### C.

Finally, we briefly address Plaintiffs' minimum wage claim, which was added in their amended complaint. The motor carrier exemption set forth in § 13(b)(1) of the FLSA applies to maximum hours and overtime requirements under the Act but not the minimum wage requirements. 29 C.F.R. § 782.1 (2004). Nevertheless, Rent–Way has moved for summary judgment on this claim as well, arguing that, at all times, it complied with the minimum wage requirement.

Rent–Way submits that, for employees like Plaintiffs who are exempt from the overtime provisions, the FLSA requires only that the amount the employee is paid for a given week is equal to or greater than the number of hours the employee actually worked times the statutory minimum wage ($5.15/hour). Otherwise stated, if an employee is paid at a rate at or above $5.15/hour for all hours the employee actually worked, there is no violation—even if the employee is paid less than his/her regular wage rate for the hours worked. *See United States v. Klinghoffer Bros. Realty Corp.,* 285 F.2d 487, 490 (2d Cir.1960). *See also* DOL Wage–Hour Division's Field Operations Handbook, 30b02 (Def.'s Reply Br. in Supp. of Mot. for Summ. Judg. [Doc. No. 28] at Ex. E) ("In [non-overtime] [workweeks] or in [workweeks] in which the [overtime] provisions do not apply, an employee subject to Section 6 of the FLSA is considered to be paid in compliance if the overall earnings for the [workweek] equal or exceed the amount due at the applicable [minimum wage].").

Plaintiffs do not dispute this principle and they conceded at oral argument that they are not seriously contesting this claim, provided that Rent–Way is accurate in its mathematical computations. We conclude that Rent–Way has successfully made a *prima facie* showing that there is no genuine factual dispute relative to this material issue. Plaintiffs having produced no evidence to contest Rent–Way's evidence, we find there is no genuine issue to be decided by a finder of fact. Accordingly, Rent–Way is entitled to summary judgment on Plaintiffs' minimum wage claim.

## IV. CONCLUSION

Based upon the foregoing reasons, Defendant's motion for summary judgment will be granted in its entirety. An appropriate order follows.

### ORDER

AND NOW, *to wit,* this day —— of September, 2004, for.the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion [Doc. No. 16] for Summary Judgment is GRANTED. JUDGMENT is hereby entered in favor of the DEFENDANT, Rent–Way, Inc., and against Plaintiffs, Justin Badgett and John P. Leasha. The Clerk is hereby directed to mark this case CLOSED.